******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HENRY FLOMO *v.* COMMISSIONER OF CORRECTION
(AC 38010)

Alvord, Prescott and Harper, Js.

*Argued September 13—officially released November 8, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Erica A. Barber*, assigned counsel, for the appellant (petitioner).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *David M. Carlucci*, special deputy assistant state's attorney, and *Leon F. Dalbec, Jr.*, former senior assistant state's attorney, for the appellee (respondent).

*Opinion*

PRESCOTT, J. The petitioner, Henry Flomo, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the habeas court improperly rejected his claims that (1) he received ineffective assistance of counsel due to his attorney's failure to advise him properly of the immigration consequences of his guilty plea in accordance with *Padilla* v. *Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010), and (2) his guilty plea was not made knowingly, intelligently, and voluntarily because the trial court failed to ensure that he fully understood the precise immigration consequences of his plea. We conclude that the habeas court properly rejected the petitioner's ineffective assistance of counsel claim on the ground that he failed to demonstrate prejudice, as required under the test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Additionally, the petitioner's second claim fails as a matter of law because immigration and naturalization consequences of a plea, although often significant, are not of a constitutional magnitude for purposes of evaluating whether a plea is knowing and voluntary. See *State* v. *Malcolm*, 257 Conn. 653, 663 n.12, 778 A.2d 134 (2001). Accordingly, we affirm the judgment of the habeas court.

The record reveals the following relevant facts and procedural history. The petitioner is a citizen of Liberia who was admitted to this country in 2010 as a permanent legal resident.[2] He was arrested in July, 2013, on charges stemming from an incident that occurred on March 7, 2013. As found by the habeas court, at the time of the incident, "[t]he petitioner was a youth leader at the fifteen year old victim's church. The petitioner picked [the victim] up after she had requested a ride and took her to his apartment, where he had some physical contact with her, and asked her for sex, which she refused." The petitioner initially was charged with attempt to commit sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1), and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). If convicted on all three charges, the petitioner faced a possible maximum sentence of forty-five years of incarceration.

At a court appearance on October 15, 2013, the court informed the petitioner that the state had extended a plea offer, his defense counsel, Richard E. Cohen, would explain the offer to him, and he would have until November 12, 2013, to accept or to reject the plea offer. In a letter to the petitioner dated October 29, 2013, Cohen memorialized that he had spoken with the petitioner regarding the pending charges, the maximum penalty that he faced if convicted of those charges, and the state's plea offer. According to Cohen's letter, if the

petitioner agreed to plead guilty to one count of sexual assault in the third degree, the state would recommend a sentence of five years, execution suspended after one year, followed by ten years of probation. Cohen further stated in the letter: "We also discussed immigration consequences. You would most likely be deported after serving your sentence." He ended the letter as follows: "I am inclined to advise you to accept the offer, although I will try to obtain a better offer."

Just prior to the petitioner's November 12, 2013 report back date, the state changed the terms of the plea offer. Instead of requiring the petitioner to plead guilty to sexual assault in the third degree, the state offered to recommend a plea agreement to the risk of injury count. Counsel met with the petitioner to discuss this new plea offer, but, as reported to the court on the record, the petitioner "remained persistent and consistent" that he did not commit any of the charged offenses. Having rejected the state's plea offer at that time, the court placed the matter on the docket for a trial.

Subsequently, on February 6, 2014, the parties appeared before the court, *Alexander, J.*, having reached a plea deal. Pursuant to the new agreement, in exchange for the petitioner's guilty plea, the state agreed to file a substitute information charging the petitioner only with risk of injury to a child in violation of § 53-21 (a) (1),[3] and to recommend a sentence of five years of incarceration, suspended after one year, followed by three years of probation with special conditions. Following a plea canvass, the court accepted the petitioner's guilty plea under the *Alford* doctrine[4] to the risk of injury charge and sentenced him in accordance with the terms of the plea agreement.

As part of the plea canvass, the court inquired whether the petitioner knew that there were potential immigration consequences of his plea. The following colloquy occurred:

"The Court: If you are not a citizen, a conviction of any crime could result in deportation, exclusion from admission, denial of your naturalization rights pursuant to the laws of the United States. Do you understand that consequence, if it applies to you?

"The Petitioner: Yes, Your Honor.

"The Court: Mr. Cohen, have you discussed that consequence with [the petitioner], if it applies?

"[Defense Counsel]: I did. It does apply, and we've discussed this several times in great detail, so he is aware that there could be some immigration issues here.

"The Court: All right. Do you need to ask your lawyer anything more about that issue at all before I go forward, or are you all set?

"The Petitioner: Yeah.

"The Court: Take a minute. Are you all set?

"The Petitioner: Yeah, I'm all set, Your Honor."

On May 23, 2014, the Department of Homeland Security initiated removal proceedings against the petitioner. On July 10, 2014, the United States Immigration Court adjudicated the petitioner to be removable from the United States on the basis of his commission of a removable offense. The petitioner appealed from that decision to the Board of Immigration Appeals (board), which vacated the decision because, in determining whether the petitioner committed a removable offense, the immigration judge had failed to consider a recent United States Supreme Court decision regarding the proper categorization of criminal offenses. See *Descamps* v. *United States*,      U.S.      , 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013). The board remanded the matter for further proceedings. On December 16, 2015, the Immigration Court rendered a new decision in which it concluded that the petitioner had committed a removable offense and that he was ineligible for relief from removal. According to the Immigration Court, any violation of § 53-21 qualifies as a crime of child abuse, child neglect, or child abandonment for immigration purposes and, as such, constitutes a removable offense. It ordered that the petitioner be removed to Liberia.[5]

On August 1, 2014, the petitioner filed the underlying petition for a writ of habeas corpus. An amended petition was filed on September 23, 2014. The amended petition contained two counts. Count one alleged a due process violation, claiming that the petitioner's plea was not made knowingly, intelligently, and voluntarily because he did not fully understand the immigration consequences of his plea, including the likelihood of deportation. Count two alleged that his trial counsel had provided ineffective assistance by, inter alia, failing to adequately research the immigration consequences of the plea or to advise the petitioner about potential consequences, and by not negotiating a plea that would have avoided the possibility of deportation.[6]

A trial on the petition for habeas corpus was conducted by the court on November 18, 2014. The petitioner submitted a pretrial memorandum of law, and both parties submitted posttrial briefs. In addition to his own testimony, the petitioner presented testimony from Cohen; Attorney Justin Conlon, an expert on immigration law; Carlene Davis, a counselor supervisor at Robinson Correctional Institution; and Charlotte Neizer, the petitioner's fiancée. The respondent, the Commissioner of Correction, did not call any witnesses.

At the habeas trial, the petitioner testified that he was unaware of the immigration consequences of his plea at the time he entered it. He stated that he never received any letter from Cohen explaining that he was most likely to be deported if he accepted the terms of

the initial plea offer. He also stated that, at the time he spoke with Cohen about accepting the later plea deal, Cohen never discussed the immigration consequences of the plea or informed him about the likelihood of deportation. He claimed that he did not believe there was any significant chance of deportation at the time he entered his *Alford* plea. The petitioner initially testified that he first learned he might have immigration consequences when he applied for and was denied transitional supervision. His habeas counsel then asked him if he remembered the court telling him during the plea canvass that there may be immigration consequences to his plea and whether that may have been when he first learned of such consequences. The petitioner responded yes, but suggested that he had no idea what the judge meant. Counsel asked the petitioner if he remembered Cohen saying during the plea canvass that he had had several discussions with the petitioner about immigration consequences. The petitioner said he remembered that, but stated that when he tried to raise his hand to address the court on the topic, Cohen had stopped him. The petitioner was asked: "If you had been told by [Cohen] that pleading guilty to risk of injury to a child under the terms of the offer that was being presented to you would've meant you pled guilty to a crime of child abuse with a near certain chance of deportation, would you have accepted the plea offer?" The petitioner responded: "No, sir."

Cohen testified, consistent with what he stated during the plea canvass, that he had discussed the immigration consequences of a guilty plea with the petitioner several times, including the potential for deportation. Cohen admitted that he did not consult with an immigration attorney or retain an immigration attorney with whom the petitioner could consult, but he testified that his understanding was always that there was a distinct possibility that the petitioner could be deported if he pleaded guilty to any of the pending charges, and he communicated that to his client. Cohen also explained during his testimony that the petitioner "was not concerned about going back to Liberia" and was "pretty emphatic" on that point. According to Cohen, "he had no problems with . . . the deportation aspect. He said he didn't care." Cohen testified that the petitioner's primary concern was with avoiding a conviction that involved misconduct of a sexual nature because there would be a stigma attached to being a convicted sex offender, both "in his native country and in his culture." Therefore, Cohen's main focus during plea negotiations had been to minimize the petitioner's sentence and to enable the petitioner to avoid sex offender registration, which he accomplished.

The habeas court issued a memorandum of decision on May 5, 2015. The court found credible Cohen's testimony that he had discussed with the petitioner the immigration consequences of his plea and that he had

told him that he would "most likely" be deported. The court also credited Cohen's testimony that the petitioner was not concerned with deportation. The court found that the petitioner's primary goals in obtaining a plea bargain "were to avoid jail time and to eliminate any charge of a sexual nature," and that he accomplished both goals by entering a plea to risk of injury under § 53-21 (a) (1). The court expressly rejected the petitioner's testimony that his counsel had failed to discuss the immigration consequences of his plea with him and that he had no idea he might be deported as a result.

Rather than analyze whether Cohen's performance was deficient under the standard set forth in *Padilla* v. *Kentucky*, supra, 559 U.S. 356; the court instead focused its analysis on whether the petitioner had established that he was prejudiced by his counsel's alleged deficient performance. The court concluded that he had not met that burden, stating in relevant part: "Here, the court finds that the petitioner was not concerned about the immigration consequences of his plea, but rather the stigma attached to a conviction for a sexual assault of a minor, and reducing his jail sentence. The plea agreement that the petitioner accepted took into account those concerns. Additionally, the petitioner has family in Liberia, including his son, mother and siblings. He presented no credible evidence to prove that it would have been a rational decision for him to reject a very favorable plea deal in favor of going to trial and facing decades in prison after which the petitioner would still likely be deported."

The court also rejected, albeit in summary fashion, the petitioner's claim that his plea had not been knowingly or intelligently made. It appears that the court based its decision primarily on the fact that the petitioner's claim was grounded upon the same evidence as the ineffective assistance claim, in particular the petitioner's testimony at the habeas trial that he did not understand the probability of his deportation at the time he entered his plea. This appeal followed.

I

We turn first to the petitioner's claim that the habeas court improperly rejected his claim that he received ineffective assistance because his counsel failed to advise him adequately of the immigration consequences of his guilty plea in accordance with *Padilla* v. *Kentucky*, supra, 559 U.S. 356.[7] Because we conclude that the habeas court properly determined that the petitioner had failed to demonstrate that he was prejudiced by counsel's allegedly deficient performance, we reject the petitioner's claim.

We begin our analysis with the legal principles that govern our review of the petitioner's claim. "A criminal defendant is constitutionally entitled to adequate and

effective assistance of counsel at all critical stages of criminal proceedings. . . .[8] This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"A claim of ineffective assistance of counsel is governed by the two-pronged test set forth in *Strickland* v. *Washington*, supra, 466 U.S. 687. Under *Strickland*, the petitioner has the burden of demonstrating that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. . . . For claims of ineffective assistance of counsel arising out of the plea process, the United States Supreme Court has modified the second prong of the *Strickland* test to require that the petitioner produce evidence that there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial. . . . An ineffective assistance of counsel claim will succeed only if both prongs [of *Strickland*] are satisfied." (Citations omitted; footnote added; internal quotation marks omitted.) *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 100–101, 111 A.3d 829 (2015); see also *Hill* v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (modifying *Strickland* prejudice analysis in cases in which petitioner entered guilty plea). "It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier." *Lewis* v. *Commissioner of Correction*, 165 Conn. App. 441, 451, 139 A.3d 759 (2016), citing *Strickland* v. *Washington*, supra, 466 U.S. 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner]").

"The [ultimate] conclusions reached by the [habeas] court in its decision [on a] habeas petition are matters of law, subject to plenary review. . . . [When] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous. . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 114 Conn. App. 778, 784, 971 A.2d 766, cert.

denied, 293 Conn. 915, 979 A.2d 488 (2009). A reviewing court ordinarily will afford deference to those credibility determinations made by the habeas court "on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude." (Internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 268, 112 A.3d 1 (2015).

Turning to the present case, the habeas court elected not to decide whether Cohen's performance was deficient in the present case. Rather, it denied the habeas petition on the basis of its determination that the petitioner's ineffective assistance claim failed on the prejudice prong of the *Strickland-Hill* test. According to the habeas court, even if the petitioner could satisfy the performance prong by demonstrating that Cohen had not thoroughly researched or competently advised him of the immigration consequences of his plea, including the likelihood of deportation, he nonetheless failed to show that, but for Cohen's deficient performance, he reasonably would have elected to reject the plea agreement offered by the state and would have insisted on going to trial. We conclude that the habeas court's determination is both legally and logically correct and supported by the record.

To satisfy the prejudice prong, the petitioner had the burden to show that, absent counsel's alleged failure to advise him in accordance with *Padilla*, he would have rejected the state's plea offer and elected to go to trial. See *Hill* v. *Lockhart*, supra, 474 U.S. 59. In evaluating whether the petitioner had met this burden and evaluating the credibility of the petitioner's assertions that he would have gone to trial, it was appropriate for the court to consider whether "a decision to reject the plea bargain would have been rational under the circumstances." *Padilla* v. *Kentucky*, supra, 559 U.S. 372. The habeas court made an explicit finding that the petitioner "was not concerned about the immigration consequences of his plea, but rather the stigma attached to a conviction for a sexual assault of a minor, and reducing his jail sentence." That finding is not clearly erroneous because it is supported by Cohen's testimony at the habeas trial that the petitioner had been adamant throughout their many discussions that he did not care about being deported to Liberia and that his real concern was in avoiding the cultural stigma associated with a conviction involving misconduct of a sexual nature. The court was free to credit Cohen's testimony that the petitioner was not concerned with the immigration consequences of his plea and that he simply wanted to avoid the potential of a conviction that would require him to register as a sex offender, which he accomplished by pleading to the risk of injury charge. The court similarly was free to reject the petitioner's testimony at the habeas trial that he would have rejected the plea and gone to trial had he been advised that he likely would face deportation as a result of his plea.

The court could have found that testimony not credible and unreasonable, particularly in light of its rejection of the petitioner's assertion that his counsel had never discussed possible immigration consequences with him, and because the petitioner faced the real possibility, if he had chosen to go to trial and lost, of receiving a much longer sentence, being required to register as a sex offender, and deportation. It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court. *Martin* v. *Commissioner of Correction*, 141 Conn. App. 99, 104, 60 A.3d 997, cert. denied, 308 Conn. 923, 94 A.3d 638 (2013).

In sum, we are convinced that the habeas court properly determined that the petitioner failed to meet his burden of demonstrating prejudice under *Strickland*.[9] Because the petitioner failed to demonstrate that he was prejudiced by his counsel's alleged deficient performance, the habeas court correctly denied his petition for a writ of habeas corpus with respect to his ineffective assistance of counsel claim.

## II

The petitioner also claims that his guilty plea to risk of injury to a child was not made knowingly, intelligently, and voluntarily because of the trial court's failure to ascertain whether the petitioner fully understood the precise immigration consequences of his plea, specifically, the near certitude of his deportation to Liberia. The petitioner suggests that the trial court had an independent obligation, distinct from his defense counsel's obligation under *Padilla*, to ensure that the petitioner was fully aware of all potential immigration consequences of a guilty plea, including the relative likelihood of deportation in his particular case, and that the court failed in this obligation. We find the petitioner's arguments unpersuasive and are bound by precedent of our Supreme Court holding that courts are not *constitutionally* obligated to canvass a defendant regarding the immigration consequences because they are not a direct consequence of a guilty plea. See *State* v. *Malcolm*, supra, 257 Conn. 663 n.12. "The failure to inform a defendant as to all possible indirect and collateral consequences does not render a plea unintelligent or involuntary in a constitutional sense." *State* v. *Gilnite*, 202 Conn. 369, 383 n.17, 521 A.2d 547 (1987).[10]

We begin our analysis by first setting forth the law governing the entry of guilty pleas. As established by the United States Supreme Court in *Boykin* v. *Alabama*, 395 U.S. 238, 242, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), "unless a plea of guilty is made knowingly and voluntarily, it has been obtained in violation of due process and is therefore voidable. . . . A plea of guilty is, in effect, a conviction, the equivalent of a guilty verdict by a jury. . . . In choosing to plead guilty, the defendant is waiving several constitutional rights, including his privilege against self-incrimination, his right to trial by

jury, and his right to confront his accusers. . . . These considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. . . . We therefore require the record affirmatively to disclose that the defendant's choice was made intelligently and voluntarily." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 253 Conn. 497, 502–503, 752 A.2d 49 (2000).

"The *Boykin* constitutional essentials for the acceptance of a plea of guilty are included in our rules and are reflected in Practice Book §§ [39-19 and 39-20]. . . . Those rules provide that the trial court must not accept a guilty plea without first addressing the defendant personally in open court and determining that the defendant fully understands the items enumerated in § 39-19, and that the plea is made voluntarily pursuant to § 39-20. *There is no requirement, however, that the defendant be advised of every possible consequence of such a plea.* . . . Although a defendant must be aware of the direct consequences of a plea, the scope of direct consequences is very narrow." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 504.

Immigration consequences of a plea are among those that our Supreme Court already has indicated are collateral in nature and, therefore, cannot implicate the constitutional concerns of *Boykin*.[11] In *State* v. *Malcolm*, supra, 257 Conn. 653, the issue before the court was whether a trial court properly had granted a defendant's motion to withdraw his guilty plea on the ground that the court had failed specifically to mention all three immigration and naturalization consequences set forth in General Statutes § 54-1j, which imposes a statutory requirement that trial courts not accept a guilty or nolo contendere plea without first canvassing the accused to ensure that he or she fully understands the immigration consequences of the plea.[12] Our Supreme Court concluded that, just as with the canvass requirements set forth in Practice Book § 39-19 to ensure that a plea is voluntary, only substantial compliance with § 54-1j, not a verbatim reading of the statutory language, is required. *State* v. *Malcolm*, supra, 661–63. In reaching that conclusion, the court also noted: "Although we do not mean to minimize the potential impact of the immigration and naturalization consequences of a plea, *they are not of constitutional magnitude*: The statutory mandate [of § 54-1j] . . . cannot transform this collateral consequence into a direct consequence of the plea. It can only recognize that this collateral consequence is of such importance that the defendant should be informed of its possibility." (Emphasis added; internal quotation marks omitted.) Id., 663 n.12.

In the present case, it is undisputed that the trial court

substantially complied with § 54-1j. The court informed the petitioner that if he was not a citizen of the United States, pleading guilty to the risk of injury charge could result "in deportation, exclusion from admission, [and] denial of your naturalization rights pursuant to the laws of the United States." The court asked the petitioner whether he had discussed these possible consequences with his attorney, and the petitioner answered in the affirmative. Counsel also indicated to the court that he had discussed the consequences with the petitioner "several times in great detail . . . ." The court asked the petitioner if he wished to consult further with his attorney about "anything more about that issue at all before I go forward," to which the petitioner responded that he was "all set . . . ." A court is permitted to rely upon a defendant's answer given in response to a plea canvass. See *State* v. *Johnson*, 253 Conn. 1, 40, 751 A.2d 298 (2000), citing *Bowers* v. *Warden*, 19 Conn. App. 440, 443, 562 A.2d 588, cert. denied, 212 Conn. 817, 565 A.2d 534 (1989).

Although the petitioner urges that the United States Supreme Court in *Padilla* rejected as an analytical tool evaluating whether immigration consequences are direct versus collateral, it did so only in the context of an ineffective assistance claim, which implicates a petitioner's sixth amendment right to counsel. See *Padilla* v. *Kentucky*, supra, 559 U.S. 366. The present claim involves whether the trial court properly ensured that the plea was knowing and voluntary and, thus, in conformance with those rights identified in *Boykin*, which did not include protection of the petitioner's right to counsel.[13] *Padilla*, therefore, is not directly applicable. Accordingly, we are bound by the Supreme Court's prior rulings, unless reversed or modified, that immigration consequences are collateral to a guilty plea and, thus, a court is not constitutionally required to canvass a defendant regarding immigration consequences in order to ensure that a plea is knowingly and voluntarily made. See *Anderson* v. *Commissioner of Correction*, 148 Conn. App. 641, 645, 85 A.3d 1240, cert. denied, 311 Conn. 945, 90 A.3d 976, cert. denied sub nom. *Anderson* v. *Dzurenda*, U.S. , 135 S. Ct. 201, 190 L. Ed. 2d 155 (2014) ("[i]t is axiomatic that this court, as an intermediate body, is bound by Supreme Court precedent and [is] unable to modify it" [internal quotation marks omitted]). We conclude that the habeas court properly denied the petitioner's due process claim that his plea was not knowingly and voluntarily made.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court granted certification to appeal from the judgment.

[2] At the time of the habeas trial, the petitioner's mother, his three siblings, and his then ten year old son continued to reside in Liberia.

[3] The original information had charged the petitioner with risk of injury to a child under subdivision (2) of subsection (a) of § 53-21, which criminalizes contact with the intimate parts of a child in a sexual or indecent manner and is a class B felony. By contrast, subdivision (1) of subsection (a) of

§ 53-21 does not require proof of misconduct of a sexual nature and is a class C felony. Furthermore, by pleading to risk of injury under § 53-21 (a) (1) rather than § 53-21 (a) (2), the petitioner would avoid mandatory registration as a sex offender in accordance with General Statutes § 54-251 (a). See *State* v. *Davenport*, 127 Conn. App. 760, 766, 15 A.3d 1154 (2011); see also General Statutes § 54-250 (2) (providing that "[c]riminal offense against a victim who is a minor," as term is used in sex offender registry statute § 54-251 [a], includes a violation of "subdivision [2] of subsection [a] of section 53-21").

[4] See *North Carolina* v. *Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[5] The petitioner's counsel indicated in her brief to this court that the petitioner has since been deported to Liberia. As a result of that representation, we asked the parties to be prepared to address at oral argument before this court, inter alia, whether the petitioner's deportation rendered the present appeal moot pursuant to our Supreme Court's holding in *State* v. *Aquino*, 279 Conn. 293, 901 A.2d 1194 (2006). In *Aquino*, the defendant, who had been residing illegally in the United States, appealed from the trial court's denial of his motion to withdraw a guilty plea. Id., 294. In his motion, he had claimed that his plea was not knowingly and voluntarily made because counsel never advised him that he faced almost certain deportation as a result of the plea. Id., 297. Our Supreme Court determined that the appeal was moot because the defendant was deported during the pendency of the appeal, and there was an "absence of any evidence that the defendant's guilty plea was the sole reason for his deportation . . . ." Id., 298.

Here, both parties argued that the present appeal is not moot because the record clearly reflects that the petitioner's guilty plea was the sole basis for his removal and, therefore, there was practical relief that could be afforded if this court were to vacate his plea. The parties' assertions are supported by the record. Our review of the record further shows that the petitioner apparently had no other criminal record that would bar his reentering this country legally. See *Quiroga* v. *Commissioner of Correction*, 149 Conn. App. 168, 174–75, 87 A.3d 1171 (finding appeal moot because even if immigration court predicated deportation order exclusively on larceny conviction challenged by petitioner, he still could not obtain any practical relief because, as he acknowledged before habeas court, he would be permanently barred from reentering the country legally because of prior narcotics convictions), cert. denied, 311 Conn. 950, 91 A.3d 462 (2014). Accordingly, on the basis of the record before us, we conclude that the present appeal is not moot, despite the petitioner's deportation.

[6] The petitioner also alleged that counsel was ineffective because he failed to adequately advise the petitioner about the length of time he actually would have to serve under the terms of the plea agreement. He later withdrew that aspect of his ineffective assistance claim, however, in his posttrial brief.

[7] "In *Padilla*, the United States Supreme Court considered whether advising a noncitizen criminal defendant of the possible deportation consequences of a guilty plea falls within the scope of representation required of criminal defense attorneys by the sixth amendment to the federal constitution and concluded that it did. . . . The court reasoned that changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important. These changes confirm our view that, as a matter of federal law, deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes. . . . The court continued: We have long recognized that deportation is a particularly severe penalty . . . but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature . . . deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century . . . . And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it most difficult to divorce the penalty from the conviction in the deportation context. . . . Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult. . . . The court thus concluded that advice regarding deportation is not categorically removed from the ambit of the [s]ixth [a]mendment right to counsel." (Citations omitted; internal quotation marks omitted.) *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 101–102, 111 A.3d 829 (2015).

[8] It is well settled that "critical stages" includes those related to the entering of a guilty plea. See *Missouri* v. *Frye*,     U.S.     , 132 S. Ct. 1399, 1405, 182 L. Ed. 2d 379 (2012).

[9] At oral argument before this court, the petitioner seemed to suggest that we should view counsel's purported failure to properly advise the petitioner regarding the near certainty of deportation in the present case as something akin to a structural error that should have precluded resolution of the petitioner's claim solely on the basis of his failure to satisfy *Strickland*'s prejudice prong. We are unconvinced.

"A structural error creates a defect in the trial mechanism such that, while it is virtually impossible to pinpoint the exact harm, it remains abundantly clear that the trial process was flawed significantly. For this reason, [e]rrors of this magnitude are per se prejudicial and require that the underlying conviction be vacated." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 739, 859 A.2d 898 (2004). "Structural [error] cases *defy analysis by harmless error standards* because the entire conduct of the trial, from beginning to end, is *obviously* affected  . . . . This court has found error to be structural only when the error renders a trial fundamentally unfair and *is not susceptible to a harmless error analysis* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 504–505, 903 A.2d 169 (2006).

Claims regarding a violation of the standards set forth in *Padilla* simply do not rise to the level of structural error. There may be instances, as in the present case, in which an alien criminal defendant is not particularly concerned with deportation or, in fact, may even wish to return to his native country. In such cases, a defense counsel's failure to properly convey immigration consequences will not play a significant role in the defendant's decision to accept a plea, and, thus, any error would be harmless. We cannot conclude that *Padilla* claims generally will be unsusceptible to harmless error analysis, a standard that generally is applied whenever assessing claims of constitutional violations. Id., 505.

[10] We note that the respondent argued in his summation before the habeas court that the petitioner's claim was procedurally defaulted and, thus, should not properly be considered by the court. The respondent, however, never raised procedural default in his response to the habeas petition, the habeas court made no findings with respect to this argument, and the respondent has not pursued it on appeal. See *Solek* v. *Commissioner of Correction*, 107 Conn. App. 473, 479 n.2, 946 A.2d 239, cert. denied, 289 Conn. 902, 957 A.2d 873 (2008). Accordingly, we do not reach the issue of whether this claim is one that is subject to the defense of procedural default.

[11] The petitioner's counsel conceded at oral argument before this court that this is the current state of the law in Connecticut.

[12] General Statutes § 54-1j provides: "(a) The court shall not accept a plea of guilty or nolo contendere from any defendant in any criminal proceeding unless the court first addresses the defendant personally and determines that the defendant fully understands that if the defendant is not a citizen of the United States, conviction of the offense for which the defendant has been charged may have the consequences of deportation or removal from the United States, exclusion from readmission to the United States or denial of naturalization, pursuant to the laws of the United States. If the defendant has not discussed these possible consequences with the defendant's attorney, the court shall permit the defendant to do so prior to accepting the defendant's plea.

"(b) The defendant shall not be required at the time of the plea to disclose the defendant's legal status in the United States to the court.

"(c) If the court fails to address the defendant personally and determine that the defendant fully understands the possible consequences of the defendant's plea, as required in subsection (a) of this section, and the defendant not later than three years after the acceptance of the plea shows that the defendant's plea and conviction may have one of the enumerated consequences, the court, on the defendant's motion, shall vacate the judgment, and permit the defendant to withdraw the plea of guilty or nolo contendere, and enter a plea of not guilty."

[13] The fundamental rights discussed in *Boykin* v. *Alabama*, supra, 395 U.S. 243, were the fifth amendment privilege against self-incrimination, and the sixth amendment rights to a jury trial and to confront one's accusers. See *State* v. *Fagan*, 280 Conn. 69, 123–24, 905 A.2d 1101 (2006) (*Vertefeuille, J.,* dissenting), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). Those rights are applicable to state criminal proceedings pursuant to the due process clause of the fourteenth amendment. See *State* v. *West*,

274 Conn. 605, 622 n.26, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005); *State* v. *Moore*, 293 Conn. 781, 784 n.2, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

———————————————