******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RICHARD HOUGHTALING *v.* COMMISSIONER
OF CORRECTION
(AC 42332)

Bright, C. J., and Prescott and Suarez, Js.

*Syllabus*

The petitioner, who had been convicted, on a plea of nolo contendere, of
various crimes related to his involvement in a marijuana grow operation,
sought a writ of habeas corpus, claiming that his trial counsel, S, had
provided ineffective assistance during the litigation of the petitioner's
motion to suppress evidence in the underlying criminal proceeding. The
petitioner, who was the owner of the property where the grow operation
was conducted, and his brother-in-law, E, were arrested when they
arrived at the property while a narcotics task force was present as part
of a marijuana eradication operation. The petitioner leased the property
to P, who was also arrested. The habeas court rendered judgment deny-
ing the petition, from which the petitioner, on the granting of certifica-
tion, appealed to this court. *Held*:

1. The habeas court properly concluded that the petitioner failed to prove that
S rendered deficient performance in litigating the motion to suppress:
a. The petitioner could not prevail on his claim that S rendered deficient
performance when he failed to inform the petitioner of his right to testify
at the suppression hearing; the court did not credit the petitioner's claim
that S advised him not to testify at the hearing and found, to the contrary,
that S's testimony that the petitioner had instructed him not to call the
petitioner as a witness at the hearing was credible.
b. The habeas court properly concluded that S's decision not to call P
to testify at the hearing did not fall below an objective standard of
reasonableness, as S was concerned that evidence connected to P's
testimony, although it may have supported the petitioner's claim of
standing, could have further implicated the petitioner in criminal activity
and S credibly testified that the petitioner had insisted that P not be
called as a witness.
c. The petitioner's claim that S's asserted justifications for his approach
to the suppression hearing were not reasonable was unavailing, as the
habeas court concluded and the record demonstrated that S's decision
to minimize the petitioner's involvement in the property was reasonably
based on the information provided to him by the petitioner, S's decision
not to involve P in the suppression hearing was reasonably based on
information the petitioner had told S, including that P posed significant
safety concerns for the petitioner and his wife, and on S's belief that
P's testimony could have further implicated the petitioner in the grow
operation and affected the terms of a plea bargain, and S's strategy in
seeking to avoid implicating E was reasonable given the petitioner's
stated desire to S not to implicate E, who faced possible, ongoing expo-
sure under federal drug laws at the time of the suppression hearing.
d. S's briefing on the issue of the petitioner's standing regarding the
suppression of evidence, which relied on *Baker* v. *Carr* (369 U.S. 186),
sufficiently supported the argument in favor of the petitioner's standing
and was informed by the facts of the case and the information given to
him by the petitioner and, thus, the petitioner's claim that S's failure
to cite to *Katz* v. *United States* (389 U.S. 347) constituted deficient
performance was unavailing.

2. The petitioner could not prevail on his claim that the habeas court deprived
him of his state and federal constitutional rights to due process of law
when it characterized in its memorandum of decision a full exhibit
admitted at the habeas trial without limitation as one admitted for only
a limited purpose, without notice to the petitioner or an opportunity to
be heard: although the court erred in stating in its memorandum of
decision that the exhibit was admitted for a limited purpose, it had
indicated to the petitioner on the first day of a three day trial that
spanned three months that it viewed the exhibit as lacking probative
value, thereby providing the petitioner with two months to gather and
to present additional evidence; moreover, this court declined to review

the claim under the plain error doctrine, as the habeas court's limited use of an exhibit it found to have little or no weight did not affect the fairness or integrity of the proceedings or result in manifest injustice to the petitioner.

3. Although the habeas court erred by excluding as an exhibit a letter to the petitioner from the Internal Revenue Service that was addressed to the property searched by law enforcement, the petitioner failed to meet his burden of proof that the exclusion of the exhibit harmed him in a way that made it more probable than not that the outcome of the habeas trial would have been different had the exhibit been admitted; in his principal brief, the petitioner failed to analyze whether the court's error in failing to admit the letter affected its conclusion as to either the deficient performance or the prejudice prong of *Strickland* v. *Washington* (466 U.S. 668), and consequently, failed to identify any cognizable harm from the habeas court's erroneous evidentiary ruling; moreover, this court declined to review the petitioner's argument regarding harm raised for the first time in his reply brief.

Argued October 8, 2020—officially released March 16, 2021

*Procedural History*

Petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Hon. Edward J. Mullarkey*, judge trial referee; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed*.

*Temmy Ann Miller*, with whom, on the brief, was *Daniel M. Erwin*, for the appellant (petitioner).

*Nancy L. Walker*, assistant state's attorney, with whom, on the brief, were *Anne Mahoney*, state's attorney, and *Jo Anne Sulik*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

BRIGHT, C. J. The petitioner, Richard Houghtaling, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus challenging his judgment of conviction arising out of a marijuana grow operation. The petitioner claims on appeal that the habeas court improperly (1) denied his claim of ineffective assistance of trial counsel in litigating the petitioner's motion to suppress in the criminal proceeding that resulted in the conviction that is the subject of his habeas petition, (2) deprived him of his state and federal constitutional rights to due process and committed plain error when it changed, without notice or any opportunity to be heard, a full exhibit admitted without limitation to one admitted only for a limited purpose, and (3) excluded from evidence a letter from the Internal Revenue Service (IRS) that was offered by the petitioner.[1] We disagree with the petitioner's first and second claims, but agree with the petitioner's third claim. Nevertheless, we conclude that the habeas court's error as to the petitioner's third claim was harmless and, therefore, we affirm the judgment of the habeas court.

The following facts, as described by our Supreme Court in its decision on the petitioner's direct appeal, are relevant to our disposition of this appeal. "On August 9, 2010, the Statewide Narcotics Task Force (task force)—comprised of federal, state, and local law enforcement officers—was conducting a marijuana eradication operation in the northeast corner of the state. The operation was comprised of two spotters who were patrolling the area in a helicopter and a ground team consisting of several members. The task force had performed marijuana eradication missions earlier in the day, and, shortly after noon, the helicopter team notified the ground team of a suspected large crop of marijuana at 41 Raymond Schoolhouse Road in the town of Canterbury (property). From the air, the spotters were able to see dozens of marijuana plants within a fenced-in pool area behind the house, as well as several plants along the outside of the fence. The ground team arrived at the property approximately thirty minutes later in separate, undercover and unmarked vehicles, which bore no resemblance to police vehicles.

"The property consisted of 5.6 acres and was largely surrounded by dense forest. The only means of ingress and egress was a narrow dirt driveway more than 100 feet long and lined with trees on both sides. There were signs marked No Trespassing posted on trees along the driveway, and, about halfway down the driveway, there was a metal gate that could block the driveway but that was not closed. . . . As the members of the ground team approached the home, they saw no occupant vehicles or persons, smelled nothing, and heard nothing. The officers knocked on the front door but received no answer.

"The ground team then left the front door and proceeded toward the back door. The air team had told the ground team that, if they continued around the side of the house, they would see a whole lot of marijuana right out in the open. Before reaching the back door, the officers saw a pool area with dozens of marijuana plants inside and additional plants surrounding the area. The officers then continued to search the property, including a greenhouse located behind the pool, near the rear of the property. As the police approached the greenhouse, they noticed it was still under construction. The ends of the structure had no side walls, and there were piles of lumber on the ground nearby. Inside the greenhouse, the police were able to see numerous marijuana plants and two men, one of whom was later identified as [Thomas] Phravixay.

"Both of the men were given *Miranda* [v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct 1602, 16 L. Ed. 2d 694 (1966)] warnings and agreed to answer questions. Phravixay told the officers he was renting the home and later gave the officers written consent to search the property. The search ultimately revealed more than 1000 marijuana plants.

"While two members of the ground crew were returning to their vehicles to obtain an evidence kit, they noticed a white van pull into the driveway of the property, where the unmarked police vehicles were parked, and then reverse back into the street and depart [v]ery quickly. The helicopter team also spotted the van enter the driveway and radioed the ground team to alert all of the officers concerning the van's presence. The officers were suspicious of the van, believing that its occupants might be involved in the marijuana grow operation, and decided to pursue the van. By the time the police got into a car, headed up the driveway after the van, and arrived out on the road, the van was already parked at the side of the road, approximately one tenth of one mile away, facing back toward the driveway.

"The officers drove to the location where the van was parked, exited their vehicle, and approached the van. . . . The van was occupied by two males—the [petitioner] was in the driver's seat and another person sat in the passenger seat. Upon determining that the occupants of the van posed no threat, the officers holstered their weapons and asked the [petitioner] for identification. When the officers asked the [petitioner] why he had pulled into the driveway and then left abruptly, he stated that he was going to visit a friend but left when he saw that the driveway was full of cars he did not recognize. As the trial court found, the [petitioner's] answers to the officers' questions were evasive, and, although he claimed to be visiting a friend, he would not name the friend. While the police were questioning the [petitioner], they were able to observe from outside the van that it contained lumber and irrigation piping

similar to that which was used to construct the greenhouse. The officers then handcuffed the [petitioner] and the passenger, and brought them back to the property.

"Upon arriving back at the property, the police advised the [petitioner] of his *Miranda* rights. The [petitioner] at first refused to speak with the police but then agreed to once the officers told him that Phravixay had consented to their search of the property, that they had found mail with the [petitioner's] name on it in the house and in the mailbox, and that Phravixay had identified the [petitioner] as the homeowner and the person who leased the property to him. The [petitioner] told the officers he had purchased the home in the prior year but could not afford the mortgage payments, so, to help cover his expenses, he leased the property to Phravixay, whom he had known for several years. The [petitioner] said Phravixay had paid rent only periodically, and the [petitioner] had been helping Phravixay cultivate marijuana for the previous four or five months to recoup some of [his] money. Although the [petitioner] said he was helping with the cultivation, he stated that, up until [that day, he] didn't realize the extent of the grow operation. I own my own business and didn't really think much of what was going on at the house . . . .

"The [petitioner] initially was charged with numerous drug related offenses, and he moved to suppress (1) all evidence seized by law enforcement officers in connection with the warrantless search and seizure conducted at [the] property on August 9, 2010; (2) all statements made by [the petitioner] and others, including . . . Phravixay, as a result of the illegal search and seizure; and (3) the fruits of any and all other evidence obtained, derived or developed as a result of the illegal search and seizure and illegally obtained statements . . . . The [petitioner] claimed that the court must suppress this evidence because the police had violated his fourth amendment rights when they failed to obtain a warrant before searching the property and when they detained him in his van, which he claims was done without reasonable suspicion that he had engaged in criminal activity.

"At the hearing on the motion to suppress, the state called three police officers to testify about their actions and observations during the search and seizure. The [petitioner] called one witness, another police officer. After the witnesses testified, the state argued that the [petitioner] had failed to establish his subjective expectation of privacy because all of his personal property was in the city of Danbury, where he lived with his wife and family, and the [petitioner] had failed by any other conduct to demonstrate a subjective expectation of privacy in the property where the search occurred. Defense counsel responded by arguing that the [petitioner's] ownership of the property alone was sufficient to establish standing. He argued that the state was trying

to get around this fact by making a hyper-technical argument on standing . . . .

"The trial court agreed with the state and denied the [petitioner's] motion to suppress the evidence seized from the search of the property and the [petitioner's] statements to the police. The trial court concluded that the [petitioner] had failed to establish that he had a subjective expectation of privacy in the property. The court also found that the police possessed a reasonable and articulable suspicion sufficient to justify stopping the [petitioner's] van after he entered and quickly exited the driveway. Lastly, the trial court concluded that the officers had probable cause to arrest the [petitioner]. The [petitioner] then entered a conditional plea of nolo contendere.

"The [petitioner] appealed to the Appellate Court from the judgment of conviction, claiming that the trial court's denial of his motion to suppress was improper because (1) he had a reasonable expectation of privacy in the area searched, including the home and the area surrounding it, (2) his fourth amendment rights were violated by the warrantless search conducted by the . . . task force, [and] (3) the police lacked a reasonable and articulable suspicion to conduct a motor vehicle stop of the van operated by the [petitioner], and his resulting arrest was unsupported by probable cause . . . . The Appellate Court rejected all of these claims. . . .

"Specifically, the Appellate Court concluded that the [petitioner's] first two claims failed because he lacked a reasonable expectation of privacy. . . . The Appellate Court determined that the [petitioner] failed to establish his subjective expectation of privacy because he did not sufficiently develop his personal relationship with the property at the suppression hearing. . . . The [petitioner] argued that he was a cooccupant of the property and cited three facts to support this contention: (1) he leased the property to Phravixay for less than his monthly mortgage payment; (2) he received and stored items on the premises; and (3) he received some mail at the property. . . .

"The Appellate Court determined that the fact that Phravixay's rent was less than the [petitioner's] mortgage established nothing about the manner in which he retained rights to use the property, or if he retained them at all. . . . Moreover, although the [petitioner] claimed that he received and stored property on the premises, he identified only a single item of his at the property—an aeration system addressed to him at his Danbury residence. . . . The court did not find that the presence of a single piece of property established that the [petitioner] was a cotenant. . . . Finally, the Appellate Court concluded that the presence of some mail . . . did not establish that the [petitioner] lived at the property or otherwise was there frequently. . . .

"The Appellate Court also concluded that the police possessed a reasonable and articulable suspicion that the [petitioner] had engaged in criminal conduct. . . . The Appellate Court determined that, on the basis of the totality of the circumstances, including the spatial and temporal link between the *Terry* [v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] stop and the investigation of the felony in progress (the marijuana grow operation), as well as the [petitioner's] act of entering and quickly leaving the property, the police were justified in stopping the [petitioner]. . . . The Appellate Court also determined that the police had probable cause to arrest the [petitioner] after they observed lumber and irrigation piping in the van similar to the materials being used to construct the greenhouse, demonstrating a probable connection between the [petitioner] and the marijuana operation at the property. . . .

"The [petitioner] appealed to [our Supreme Court] from the judgment of the Appellate Court, and [our Supreme Court] granted certification on the following issues: (1) Did the Appellate Court properly determine that the [petitioner] did not have standing (a reasonable expectation of privacy) to challenge a search of residential premises that he owned but had leased at the time of the search? . . . (2) If the answer to the first question is in the negative, were all subsequent actions of the police—the *Terry* stop of the vehicle, the warrantless arrest, and the defendant's confession—the fruits of one or more preceding illegalities? . . . (3) If the answer to the first question is in the affirmative, did the Appellate Court properly determine that the *Terry* stop and warrantless arrest of the defendant were lawful, and that the resulting confession was lawfully obtained? . . . [Our Supreme Court answered] the first question in the affirmative, [did not] reach the second question, and [answered] the third question in the affirmative. [Our Supreme Court thus affirmed] the judgment of the Appellate Court." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Houghtaling*, 326 Conn. 330, 333–39, 163 A.3d 563 (2017), cert. denied,      U.S.     , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018). In concluding that this court properly determined that the petitioner did not have standing, our Supreme Court held that the petitioner failed to establish a subjective expectation of privacy because he did not present sufficient evidence detailing his connection to the property or the marijuana grow operation that took place on the property. See id., 352.

On October 24, 2017, the petitioner filed a petition for a writ of habeas corpus alleging ineffective assistance of trial counsel, Alan Sobol. On September 4, 2018, after a trial that took place over the course of three days, the habeas court denied the petition. The habeas court concluded that the petitioner failed to prove that trial

counsel rendered deficient performance as alleged and that, even if the court presumed deficient performance, the petitioner failed to prove that he was prejudiced by counsel's deficient performance. Following the ruling of the habeas court, the petitioner filed a petition for certification to appeal, which was granted by the habeas court. This appeal followed.

I

The petitioner claims that Sobol rendered deficient performance when he litigated the petitioner's motion to suppress by (1) failing to inform the petitioner of his right to testify, (2) limiting the evidence presented regarding the petitioner's standing to challenge the constitutionality of the search, (3) utilizing a three-pronged approach that was not a reasonable strategic basis for his decisions, and (4) relying on *Baker* v. *Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), in lieu of *Katz* v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), in the petitioner's memorandum in support of the motion to suppress. The petitioner also contends that he was prejudiced by trial counsel's alleged deficient performance because, but for Sobol's failure to establish that the petitioner had standing to raise a fourth amendment claim, the petitioner's motion to suppress would have been successful.

We begin our discussion by setting forth guiding principles of law as well as our standard of review, which are well settled. "A criminal defendant's right to the effective assistance of counsel extends through the first appeal of right and is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in [*Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"On appeal, [a]lthough the underlying historical facts found by the habeas court may not be disturbed unless they [are] clearly erroneous, whether those facts constituted a violation of the petitioner's rights [to the effective assistance of counsel] under the sixth amendment is a mixed determination of law and fact that requires

the application of legal principles to the historical facts of [the] case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 829–31, 234 A.3d 78, cert. granted, 335 Conn. 931, 236 A.3d 218 (2020).

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . . . Nevertheless, [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citation omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 679, 51 A.3d 948 (2012).

"The reasonableness of counsel's actions may be determined or substantially influenced by the [petitioner's] own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." (Internal quotation marks omitted.) Id., 681.

"[T]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the

same way." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 637, 212 A.3d 678 (2019). The United States Supreme Court has cautioned that a reviewing court, in considering whether an attorney's performance fell below a constitutionally acceptable level of competence pursuant to the standards set forth herein, must "properly apply the strong presumption of competence that *Strickland* mandates" and is "required not simply to give [trial counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons [that counsel] may have had for proceeding as they did . . . ." (Citation omitted; internal quotation marks omitted.) *Cullen* v. *Pinholster*, 563 U.S. 170, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). This strong presumption of professional competence extends to counsel's investigative efforts; see *Thompson* v. *Commissioner of Correction*, 131 Conn. App. 671, 698, 27 A.3d 86, cert. denied, 303 Conn. 902, 31 A.3d 1177 (2011); as well as to choices made by counsel regarding what defense strategy to pursue. See *Veal* v. *Warden*, 28 Conn. App. 425, 434, 611 A.2d 911, cert. denied, 224 Conn. 902, 615 A.2d 1046 (1992). With the foregoing legal principles in mind, we turn to the petitioner's arguments in support of his claim of ineffective assistance of counsel.

A

The petitioner's first contention is that Sobol rendered deficient performance by failing to inform the petitioner of his right to testify at the suppression hearing. The respondent, the Commissioner of Correction, argues, to the contrary, that Sobol discussed the issue of testifying with the petitioner. The respondent contends that Sobol advised the petitioner that the state might respond to his potential testimony by calling Phravixay, which was a result that the petitioner wanted to avoid because he and his wife feared retribution from Phravixay.

"It is the responsibility of trial counsel to advise a defendant of the defendant's right to testify and to ensure that the right is protected. . . . The decision of whether to testify on one's own behalf, however, ultimately is to be made by the criminal defendant." (Citation omitted; internal quotation marks omitted.) *Victor C.* v. *Commissioner of Correction*, 179 Conn. App. 706, 715, 180 A.3d 969 (2018). "A defendant is entitled to decide whether to testify in his or her own case and is further entitled to have advice from counsel concerning that decision. . . . Counsel's duty to advise includes the duty to keep the defendant informed of all developments in the case material to the defendant's decision to testify. . . . Deciding whether to testify on one's own behalf is often among the most difficult choices a criminal defendant must make during trial. Testifying can present a risky and difficult ordeal for a defendant. Defense counsel therefore must keep the

defendant apprised of all material information known to counsel in order to help the defendant in making that decision." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Helmedach* v. *Commissioner of Correction*, 329 Conn. 726, 740, 189 A.3d 1173 (2018).

The record reveals the following relevant facts. At the habeas trial, Sobol testified that he specifically discussed with the petitioner what could occur at the suppression hearing if the petitioner chose to testify. Sobol testified that he told the petitioner that the state likely would call Phravixay to rebut the petitioner's testimony and also would try to implicate the petitioner along with William Eichen, the petitioner's brother-in-law, in the marijuana grow operation. Later in the hearing, Sobol stated that the petitioner told him that he did not want to testify. Sobol also stated that he had informed the petitioner that he agreed with the petitioner's decision because he believed that it would be more harmful than helpful to the petitioner. Sobol testified that he based his decision on the scant information provided to him by the petitioner, along with the petitioner's communication that he spent all of his time in Danbury.

At the habeas hearing on April 27, 2018, habeas counsel and Sobol engaged in the following colloquy: "[The Petitioner's Habeas Counsel]: Did you advise [the petitioner] that he could testify at the hearing on the motion to suppress and that his testimony could not be used against him by the state at any subsequent criminal trial in their case-in-chief?

"[The Witness]: No.

"[The Petitioner's Habeas Counsel]: Why?

"[The Witness]: Because that conversation would have been premature, that's the right verbiage, because he was quite explicit in instructing us not to call him as a witness, that he did not want to testify for a multitude of reasons, primarily, primarily of which was the concern that were he to testify, it would in all likelihood have brought Mr. Phravixay into the case as a rebuttal witness, and he was concerned about his fears for him and his family, and also Mr. Phravixay's testimony would have further implicated Mr. Eichen, his brother-in-law, and so I never—I did not get into the hypothetical of you're telling me you don't want to testify, and I'm also telling you that if you do testify, in my opinion, as I testified the last time I was here, that in all likelihood, Mr. Phravixay would testify, and he said I'm not testifying. I don't want to testify. Don't call me. So I did not get into the hypothetical question, well, you're instructing me not to call you. You don't want to testify, but by the way—not by the way—but on the other hand, if you change your mind or down the road you decide to testify, this, that or the other, I did not get into a [*Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967,

19 L. Ed. 2d 1247 (1968)] discussion, nor get into the derivative use of his testimony because he was explicit in saying, I don't want to testify. Do not call me. That's why."[2]

In contrast to Sobol's testimony, the petitioner testified that Sobol discussed the use of his testimony on one occasion during which Sobol told him that he never places his clients on the stand to testify. The petitioner's sister, Holly Eichen, also testified that Sobol stated to her that he would never place his clients on the stand.

In its memorandum of decision, the habeas court rejected the petitioner's claim that he was advised not to testify at the hearing on the motion to suppress, finding that Sobol's testimony on this issue was credible, whereas the testimony of the petitioner and his sister was not. We will not disturb a habeas court's factual finding that turns on its evaluation of the credibility of witnesses. See *Flomo* v. *Commissioner of Correction*, 169 Conn. App. 266, 279, 149 A.3d 185 (2016) ("[a] reviewing court ordinarily will afford deference to those credibility determinations made by the habeas court on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude" (internal quotation marks omitted)), cert. denied, 324 Conn. 906, 152 A.3d 544 (2017). Thus, upon review of the record, we conclude that the petitioner has not met his burden of showing that Sobol performed deficiently when advising the petitioner regarding whether he should testify at the suppression hearing.

B

The petitioner's next contention is that Sobol's strategy to limit "standing evidence on the theory that the judge might punish the petitioner for filing a motion to suppress" was unreasonable. Citing to *State* v. *Revelo*, 256 Conn. 494, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001), the petitioner argues that the basis for Sobol's strategic decision previously has been rejected by our Supreme Court, which held that a court may not penalize an accused for exercising a statutory or constitutional right by increasing his or her sentence solely because of that election. Specifically, the petitioner points to evidence that could have been introduced via Phravixay to establish that the petitioner had a sufficient expectation of privacy on the property to give him standing to pursue the motion to suppress.

The record reveals the following relevant facts. At the habeas trial, Sobol testified that presenting evidence to support the petitioner's claim that he had standing to raise a fourth amendment claim via Phravixay's testimony could have resulted in the judge not accepting a conditional nolo contendere plea and may have negatively impacted the petitioner at sentencing if the judge were to credit Phravixay's testimony. He testified that

if the petitioner did not prevail on every single issue on the motion to suppress, he could not, "unring the bell." Sobol also testified that "I did everything I could to preserve the five [years] after four [years served sentence] when [the state's attorney assigned to the petitioner's criminal case, Matthew Crockett] said if you do the motion to suppress, it's seven [years] after six [years] I think." Sobol further testified that the petitioner communicated on multiple occasions that he did not want Phravixay to testify.

Crockett testified at the habeas trial that, if the petitioner had testified to the ownership of the contraband and his involvement in the marijuana grow operation, he may have called witnesses to rebut or to impeach the petitioner. Crockett testified that he would not have sought higher punishment for the petitioner if, in connection with the motion to suppress, the petitioner had taken responsibility for the ownership of the marijuana and his involvement in the grow operation at the time of the motion to suppress.

The habeas court, in its memorandum of decision, concluded that the petitioner had failed to establish that Sobol's performance in failing to call Phravixay as a witness fell below an objective standard of reasonableness or created a reasonable probability that the outcome of the motion to suppress would have been different.[3]

Our Supreme Court in *State* v. *Revelo*, supra, 256 Conn. 496, addressed the issue of whether the due process rights of a defendant were violated when the trial court (1) offered to sentence the defendant to eight years imprisonment for the defendant's plea of guilty in connection with the defendant's sale of narcotics, (2) withdrew the offer upon learning that the defendant wanted to exercise his right to a judicial determination of his then pending motion to suppress, (3) informed the defendant that he would receive a sentence of nine years of imprisonment if he decided to plead guilty in the event that his motion to suppress was denied, and (4) imposed a nine year sentence following the defendant's conditional plea of nolo contendere, which the defendant had entered as a result of the denial of his motion to suppress.

In *Revelo*, the defendant contended that the trial court improperly penalized him for exercising his right to a judicial determination of his motion to suppress by increasing the terms of the plea bargain from eight to nine years solely because of his decision to exercise that right. Id., 508. The court held that, "[a]lthough a court may deny leniency to an accused who, like the defendant, elects to exercise a statutory or constitutional right, a court may not penalize an accused for exercising such a right by increasing his or her sentence solely because of that election." Id., 513. The court further held that, "[a]lthough the distinction between

refusing to show leniency to an accused who insists on asserting a constitutional right and punishing an accused for asserting that right may, at times, be a fine one, there is no difficulty in discerning what occurred in this case: the trial court imposed a more severe sentence on the defendant solely because he asserted his right to a judicial ruling on his motion to suppress." Id., 513–14. The court went on to state: "Moreover, it would not have been improper for the court, upon learning of the defendant's decision to reject that offer, to inform the defendant of the potential for a greater sentence in the event his motion was denied. In such circumstances, however, it also would be incumbent upon the court to explain why a greater sentence might be appropriate . . . to dispel any suggestion that the court was prepared to punish the defendant merely for exercising his right to a judicial determination of his motion. Indeed, the failure of the trial court in this case to provide such an explanation is a critical factor in our conclusion that the court overstepped its constitutional bounds by adding one year to the defendant's sentence." (Citation omitted.) Id., 516.

In a footnote, however, the court noted that "the *prosecutor* would not have been barred from threatening to *recommend* a greater sentence in the event the defendant refused to plead guilty prior to obtaining a ruling on his motion to suppress. Moreover, if the prosecutor had taken that position, we see no reason why the court would have been prohibited from informing the defendant of the possibility of a greater sentence if he pressed and lost his motion to suppress because, in that event, the prosecutor's hand would be strengthened considerably, and, in addition, the defendant arguably would be entitled to less consideration for his plea than if he had chosen to accept responsibility for the offense at an earlier stage of the proceedings." (Emphasis in original.) Id., 515 n.28.

In the present case, the petitioner's reliance on *Revelo* is misplaced. The petitioner misunderstands Sobol's concerns about calling Phravixay to establish the petitioner's involvement with the marijuana grow operation. Although such evidence may have been of assistance in establishing the petitioner's standing to pursue the motion to suppress, it also could have had the effect of further implicating the petitioner in the crime. This is the bell that Sobol noted could not be unrung. Certainly, the state and the court could have taken into account the petitioner's culpability in the grow operation in fashioning any plea offer. It was reasonable for Sobol to be concerned about the eventual outcome of the case as he decided how to balance proving the petitioner's standing to raise the motion to suppress while, at the same time, limiting the evidence that proved the petitioner's active involvement in the grow operation. In addition, Sobol testified repeatedly, and the habeas court found such testimony credible, that

the petitioner was insistent that Phravixay not be called as a witness at the suppression hearing. Under these circumstances, the habeas court properly concluded that the petitioner did not establish that Sobol's performance, in deciding not to present the testimony of Phravixay, fell below an objective standard of reasonableness.

C

The petitioner also argues more generally that Sobol's asserted justifications for his approach to the suppression hearing were not reasonable. Specifically, the petitioner argues that minimizing the petitioner's involvement in the property was antithetical to the motion to suppress, Sobol did not have any reason to fear antagonizing Phravixay, and his concern about potentially implicating Eichen in the crime was unreasonable.

The following additional facts are relevant to the petitioner's arguments. At the habeas trial, Sobol testified that his theory of defense was based on a three-pronged approach. The first prong addressed the facts of the case that suggested the petitioner's presence on the property and involvement with the grow operation was thin. The second prong sought to avoid the involvement of Phravixay in the case. The third prong sought to avoid the potential criminal implication of Eichen in the case. Sobol testified that the petitioner told him that he was on the property only occasionally, that Phravixay posed significant safety concerns for the petitioner and his wife, and that he desired to avoid implicating Eichen, his brother-in-law, in the case. Sobol also testified that the ultimate strategy was to approach the motion to suppress via direct examination or cross-examination of witnesses whose testimony would not trigger the involvement of Phravixay and Eichen.

We first address the petitioner's contention that minimizing his involvement in the property was not a reasonable strategy as it was antithetical to establishing the petitioner's standing to pursue the motion to suppress. Our review of the record does not support the petitioner's contention. During the habeas trial, Sobol testified that his conclusion that the petitioner had limited involvement with the property was based on what the petitioner told him. Sobol stated that it was undisputed that the petitioner was the owner of the property and, in essence, had yielded dominion and control of the property to Phravixay. In particular, Sobol testified that the petitioner communicated that he did not sleep or live at the property, he rarely was at the property because of his business in Danbury and New Milford, he rented the property to Phravixay, who compensated the petitioner with cocaine and marijuana, and he was not engaged in a joint venture of growing marijuana on a large scale on the property. Additionally, the habeas court concluded that the record contained no persua-

sive evidence that the petitioner resided at the property, and that Sobol strove to prevail on the standing issue in spite of the information the petitioner gave him.

The record demonstrates that Sobol's decision to minimize the petitioner's involvement in the property was reasonably based on the evidence available to Sobol at the time of the motion to suppress, which included the petitioner's own statements that he had little to do with the property. Thus, Sobol had to pursue a strategy that was consistent with the petitioner's limited involvement with the property because that was the information the petitioner gave to Sobol. Although that information may have made it more difficult for the petitioner to establish standing to pursue the motion to suppress, any such difficulty is attributable to the petitioner and not to Sobol. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681 (counsel entitled to rely on information provided to him by petitioner).

Next, the petitioner contends that Sobol's decision not to call Phravixay as a witness at the suppression hearing, on the basis that the petitioner feared Phravixay, was not a reasonable strategic decision. The respondent contends that Sobol testified that the petitioner was clear about his desire to not have Phravixay testify. The respondent also contends that Phravixay's testimony could have implicated the petitioner in the marijuana grow operation and also could have implicated the assets of the petitioner and his family. We agree with the respondent.

At the habeas trial, Sobol testified that his decision to avoid antagonizing Phravixay was based on the petitioner telling him that Phravixay was a dangerous gang member, who posed significant safety concerns for the petitioner and his wife. Sobol also testified that he was concerned that Phravixay would implicate the petitioner in the marijuana grow operation and would, thus, negatively affect the petitioner's plea negotiations.

The petitioner testified that he lied to Sobol about his belief concerning Phravixay's criminal affiliations and his concerns about the safety of himself and his family. The petitioner also stated that he did not instruct Sobol to avoid involving Phravixay in the matter. The habeas court, however, did not credit the petitioner's testimony. By contrast, the court found Sobol to be credible.

Considering all of the circumstances from Sobol's perspective at that time, the petitioner has not shown that Sobol's strategy to avoid triggering the involvement of Phravixay was unreasonable. Sobol was concerned that the trial court may have imposed a sentence that was harsher than the terms of the plea bargain on the basis of Phravixay's potentially adverse testimony, and the habeas court credited Sobol's testimony that the

petitioner had instructed him not to call Phravixay to testify. As noted previously in this opinion, counsel properly may rely "on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]." *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681. Thus, we conclude that Sobol's decision to avoid involving Phravixay in the case did not fall below an objective standard of reasonableness.

The petitioner's third contention is that the perceived threat that Eichen would be arrested was not a viable consideration because Sobol's duty of loyalty was to the petitioner, and Sobol should have known the timing and effect of a nolle prosequi, which Crockett had entered as to the charges against Eichen. The respondent contends that the habeas court found that Eichen faced possible, ongoing exposure under federal drug laws at the time of the suppression hearing. The respondent also contends that Sobol testified that he was instructed by the petitioner to not implicate Eichen.

In the present case, the petitioner has not met his burden of proving that Sobol's trial strategy in seeking to avoid implicating Eichen constituted deficient performance. As the habeas court noted, at the time of the hearing on the motion to suppress, the federal statutes of limitations relating to Eichen's arrest had not expired. Moreover, Sobol testified repeatedly about the petitioner's communicated desire to not implicate Eichen in the case. The petitioner, here, has not overcome the presumption that Sobol's strategic decision to avoid implicating Eichen was reasonable given the petitioner's firm conviction not to implicate his brother-in-law.

In sum, we conclude that the petitioner failed to establish that Sobol's approach to the case, and in particular to the suppression hearing, was deficient given the information available to him and the demands made on him by the petitioner.

### D

The petitioner also contends that trial counsel's failure to cite to *Katz* v. *United States*, supra, 389 U.S. 347, in his memorandum in support of the petitioner's motion to suppress was objectively unreasonable and constitutes deficient performance. The petitioner argues that Sobol instead incorrectly relied on *Baker* v. *Carr*, supra, 369 U.S. 186, to support the motion to suppress. The petitioner argues that doing so was improper because *Baker* concerned standing to contest the constitutionality of a statute, whereas *Katz* specifically addressed standing to contest a search. In response, the respondent contends that Sobol, in fact, did cite to *Katz* for the proposition that warrantless searches almost always are unreasonable. The respondent further argues that Sobol relied on the standing principles in *Katz*, even though he did not mention *Katz*

when doing so.

In its memorandum of decision, the habeas court concluded that *Baker* v. *Carr*, supra, 369 U.S. 186, sufficiently supported Sobol's arguments and that the petitioner failed to show how reliance on *Katz* v. *United States*, supra, 389 U.S. 347, would have resulted in the criminal trial court concluding that he had standing. The habeas court also concluded that the fact that Sobol relied on *Baker*, instead of *Katz*, is not much of a basis for a claim of deficient performance, when Sobol's strategy was informed by the facts of the case and the information given to him by the petitioner.

We agree with the habeas court that Sobol's briefing of the standing issue was not deficient. The following additional facts from the record are pertinent to the resolution of the petitioner's argument. In the petitioner's memorandum in support of his motion to suppress the evidence before the trial court, the petitioner argued that the warrantless search of his property violated the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution. Specifically, the petitioner argued that the warrantless search of his property violated his constitutional rights because it did not fall under any exceptions to the warrant requirement, and the exclusionary rule mandates the suppression of evidence that was illegally obtained. The petitioner contended that (1) the area searched constituted a curtilage, as opposed to an open field where an individual may not legitimately expect privacy for activities conducted in the open field, (2) warrantless searches of property that are conducted subsequent to a warrantless aerial surveillance are not necessarily reasonable, (3) the plain view doctrine does not apply to warrantless searches, (4) no exigent circumstances were present, (5) the initial stop of the petitioner's vehicle was an invalid *Terry* stop, (6) even if law enforcement conducted a valid stop of the petitioner's vehicle, their conduct exceeded the scope of a proper stop, (7) any consent to search the premises was the result of law enforcement's illegal police conduct, and (8) the petitioner had standing to challenge the statements and the consent to search given by Phravixay.

In contending that he had standing to challenge the consent to search provided by Phravixay, the petitioner, in his memorandum in support of his motion to suppress, cited to *Baker*, in support of his argument that he had a personal stake in the ruling on the motion to suppress due to his interest in avoiding conviction. See *Baker* v. *Carr*, supra, 369 U.S. 204. The petitioner also cited to *State* v. *Mitchell*, 56 Conn. App. 561, 565, 744 A.2d 927, cert. denied, 253 Conn. 910, 754 A.2d 162 (2000), for this court's reliance on the holding in *United States* v. *Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980), namely, that a defendant must first

establish a reasonable expectation of privacy in the premises before he may assert that his fourth amendment rights have been violated by improper intrusion into those premises.

The memorandum also addressed specifically why the petitioner had a legitimate expectation of privacy in the property. In particular, Sobol relied on the principles set forth in *Katz* v. *United States*, supra, 389 U.S. 347, in contending that the area searched constitutes a curtilage and that the petitioner had an expectation of privacy in that area. See *State* v. *Davis*, 283 Conn. 280, 324, 929 A.2d 278 (2007) ("the [reasonable expectation of privacy] test offers no exact template that can be mechanically imposed upon a set of facts to determine whether . . . standing is warranted" (internal quotation marks omitted)). In *Katz*, the Supreme Court set forth the following test to establish standing: "(1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises or seized property]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . The burden of proving the existence of a reasonable expectation of privacy rests [with] the defendant." (Internal quotation marks omitted.) *State* v. *Jacques*, 332 Conn. 271, 279, 210 A.3d 533 (2019). Consistent with this test, Sobol argued that the area searched constituted a curtilage because it was located immediately behind the residence and was enclosed by a fence, the area was enclosed by dense trees and foliage, the area lent itself to use for intimate activities such as swimming and gardening, and the area was fully protected from public view. Sobol also argued that the petitioner had an expectation of privacy with respect to the area, despite having Phravixay on the property as a tenant, because the petitioner owned and had a possessory interest in the property that he had not relinquished.

Moreover, the record shows that Sobol testified that his options for addressing the standing issue were limited by the lack of credible evidence of the petitioner's presence on the property. In line with his testimony, and the information the petitioner had provided to him, Sobol, in the memorandum in support of the petitioner's motion to suppress, needed to find an alternative to relying on specific evidence of the petitioner's use of the property to show the existence of a reasonable expectation of privacy in the area searched. Consequently, he argued that the petitioner had a legitimate expectation of privacy in the area searched because the property was a curtilage and because the petitioner owned and had a possessory interest in the property. See id., 287 ("We recognize that property law concepts do not necessarily control our fourth amendment inquiry. They are, however, clearly a factor to be considered." (Internal quotation marks omitted.)).

In the present case, the habeas court concluded, and the record supports, that Sobol's strategy was informed by the facts of the case and the information given to him by the petitioner. "Indeed, we recognize that [t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [they] did . . . ." (Internal quotation marks omitted.) *Robert S.* v. *Commissioner of Correction*, 194 Conn. App. 382, 393, 221 A.3d 493 (2019), cert. denied, 334 Conn. 913, 221 A.3d 446 (2020). Therefore, in considering the record, we agree with the habeas court that Sobol's failure to discuss *Katz* v. *United States*, supra, 389 U.S. 347, in detail, in support of the petitioner's motion to suppress, did not constitute deficient performance.

For the reasons set forth herein, we conclude that the habeas court properly concluded that the petitioner failed to prove that Sobol rendered deficient performance in litigating the petitioner's motion to suppress.[4]

II

Next, the petitioner claims that the habeas court deprived him of his state and federal constitutional rights to due process of law[5] and committed plain error when, without notice or opportunity to be heard, the habeas court changed a full exhibit admitted at the habeas trial without limitation to one admitted only for a limited purpose. We disagree.

The following additional facts are necessary to the resolution of this claim. At the February 26, 2018 habeas trial, petitioner's exhibit 13 was marked as a full exhibit without objection. The exhibit consists of a fax cover sheet, attached to which is a document entitled "Second Draft of Proffer by Thomas Phravixay for Discussion Purposes Only." The document, drafted by Phravixay's attorney before the petitioner pleaded guilty, set forth a proposed statement that Phravixay might be willing to make regarding, inter alia, the petitioner's involvement in the marijuana grow operation. At the habeas trial, Sobol testified that exhibit 13 was given to him upon request from Attorney Christian Sarantopoulos, who had been the petitioner's previous criminal trial attorney. Sobol testified that the draft proffer stated the opposite of what the petitioner had communicated to counsel with regard to his presence on the property, his role in the marijuana grow operation, and his fear of Phravixay.[6] Sobol further testified that the draft proffer was unsigned, and he was unable to testify as to whether the draft proffer was sworn to under oath.

At the trial before the habeas court, Attorney Brian Woolf, who represented Phravixay in relation to the

criminal charges arising out of his arrest at the property, testified that he had drafted the proffer to provide information to the assistant state's attorney, Crockett, in anticipation that, if the draft proffer was accepted, Phravixay might testify at a trial of the petitioner. Asserting the attorney-client privilege, Woolf declined to testify as to whether the draft proffer was a rendition of the information that Phravixay had provided to him. Habeas counsel, asserting that Phravixay's attorney-client privilege had been waived, requested that the habeas court order Woolf to answer whether the draft proffer was a rendition of the information that Phravixay had provided to him. Habeas counsel sought to utilize Woolf's testimony, among additional purposes, to show the effect of the draft proffer's statements on the listener, in particular, Sobol. The habeas court sustained the objection to habeas counsel's inquiry, stating: "You're lucky you got this in as a full exhibit. Objection sustained. Move on." Woolf later testified that he did not independently verify anything with respect to the draft proffer, but that it was his general practice to verify the information of a proffer prior to finalizing the document.

The habeas court made several remarks as to the weight of the draft proffer. The habeas court noted that the draft proffer was not signed, stamped or sworn to. The habeas court also stated that "[exhibit 13] may be a full exhibit, but it's the emptiest full exhibit I think I've ever seen." In response to habeas counsel's inquiry to Sobol about the information contained in the proffer, the habeas court stated: "Have I made myself unclear? To paraphrase the late John Nance Garner, it's not worth a warm bucket of spit. It has no provenance."

In its memorandum of decision, the habeas court stated the following regarding the draft proffer: "Attorney Brian Woolf testified on April 27, 2018, that he had represented Mr. Phravixay in the drug case. He prepared a proffer for the purposes of negotiations with the state's attorney. Petitioner's exhibit 13. The proffer was unsigned and unsworn. It was not in Mr. Phravixay's own words and the contents were not verified by Woolf. This proffer, premarked by both parties, was only allowed to remain in this trial as an exhibit to show its effect upon Sobol, not for the truth of its contents. If Mr. Phravixay had waived his fifth amendment rights and if he had testified according to the proffer's contents, then it would have been helpful to the petitioner's claim of standing. Those are two big 'ifs.' Sobol testified that in the proffer Phravixay did not claim that the petitioner had exclusive control of the property. Although his federal fifth amendment rights had expired, Phravixay was not produced at the habeas trial and the petitioner has failed completely to prove what he would have said at the motion to suppress [hearing]. Here, if anything, petitioner's exhibit 13 may explain why the petitioner was so anxious to keep Mr. Phravi-

xay off the stand at the motion to suppress hearing since the proffer describes an extensive marijuana cultivation business ongoing since 2003 involving the petitioner's legitimate business location, his sister's house, and even his mother's property in New Milford. And one never knows what an incarcerated coconspirator will choose to say about his free coconspirator after that person had asked him to take 'the weight.' "

The petitioner, here, argues that exhibit 13 was admitted as a full exhibit without any objection, the petitioner was not given proper notice or opportunity to object prior to the habeas court's characterization of the exhibit in its memorandum of decision as a limited purpose exhibit, the habeas court's characterization of the exhibit as a limited purpose exhibit was a violation of due process, and it constitutes plain error.

A review of the record reflects that the habeas court erroneously stated in its memorandum of decision that exhibit 13 was admitted for the limited purpose of showing its effect upon Sobol. At the February 26, 2018 hearing before the habeas court, exhibit 13 was marked as a full exhibit without objection and, therefore, exhibit 13 was evidence in the case for all purposes. See *Hoffkins* v. *Hart-D'Amato*, 187 Conn. App. 227, 237, 201 A.3d 1053 (2019) ("[w]hen [a]n exhibit [is] offered and received as a full exhibit [it] is in the case for all purposes . . . and is usable as proof to the extent of the rational persuasive power it may have" (internal quotation marks omitted)). Nevertheless, it is the function of the habeas court, as the trier of fact, "to consider, sift, and weigh all the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Campbell*, 169 Conn. App. 156, 165, 149 A.3d 1007, cert. denied, 324 Conn. 902, 151 A.3d 1288 (2016).

"Whether a party was deprived of his due process rights is a question of law to which appellate courts grant plenary review. . . . The core interests protected by procedural due process concern the opportunity to be heard at a meaningful time and in a meaningful manner." (Citation omitted.) *McFarline* v. *Mickens*, 177 Conn. App. 83, 100, 173 A.3d 417 (2017), cert. denied, 327 Conn. 997, 176 A.3d 557 (2018).

"Fundamental tenets of due process require that all persons directly concerned in the result of an adjudication be given reasonable notice and opportunity to present their claims or defenses. . . . It is the settled rule of this jurisdiction, if indeed it may not be safely called an established principle of general jurisprudence, that no court will proceed to the adjudication of a matter involving conflicting rights and interests, until all persons directly concerned in the event have been actually or constructively notified of the pendency of the proceeding, and given reasonable opportunity to appear and be heard. . . . It is fundamental in proper judicial administration that no matter shall be decided unless

the parties have fair notice that it will be presented in sufficient time to prepare themselves upon the issue." (Citations omitted; internal quotation marks omitted.) *Urich* v. *Fish*, 58 Conn. App. 176, 181, 753 A.2d 372 (2000).

The petitioner argues that his right to due process was violated by the court's having limited, sua sponte, the use of exhibit 13 because it may have affected the petitioner's decision to not present additional evidence due to exhibit 13 being admitted as a full exhibit. The petitioner also contends that exhibit 13 was sufficient to establish that he had standing to challenge the search. We are not persuaded.

The petitioner's argument elevates form over substance. Having reviewed the record in this case, we conclude that it is clear that the habeas court gave the petitioner reasonable notice that, in its view, exhibit 13 lacked any probative value, and that it considered the weight of the exhibit as not being worth "a warm bucket of spit." Thus, the petitioner was on notice that he should not rely on exhibit 13 to prove any fact important to his case. In fact, we find it significant that the court's comments about exhibit 13 having little or no evidentiary value took place during the first day of the habeas trial, February 26, 2018. The second and third days of the trial did not take place until April 27, 2018, and May 8, 2018. Consequently, the petitioner had more than two months to gather and present additional evidence after the court informed him that exhibit 13 "has no provenance." Thus, his claim on appeal that, had he known that the court was going to treat exhibit 13 as admitted for a limited purpose, he would have submitted additional evidence simply is not persuasive.

In addition, because the habeas court, as the trier of fact in this instance, is responsible for assessing the credibility and weight of the evidence; see *State* v. *Campbell*, supra, 169 Conn. App. 165; we conclude that the petitioner is unable to demonstrate that the habeas court's action deprived the petitioner of due process essentially by disagreeing with the petitioner as to exhibit 13's evidentiary value. The record reflects that the habeas court, in its memorandum of decision, made clear that it did not share the petitioner's view that exhibit 13 established the petitioner's standing to challenge the search of the property. The court, in its memorandum of decision, fully explained the many reasons that it found exhibit 13 to have little or no weight. The court's reasoning in this regard should have come as no surprise to the petitioner because it was consistent with the comments the court made about exhibit 13 during the trial. Therefore, we conclude that the habeas court did not violate the petitioner's due process rights by stating in its memorandum of decision that exhibit 13 was a limited purpose exhibit.

The petitioner also claims that the habeas court's

characterization of exhibit 13 as a limited purpose exhibit constitutes plain error. "[T]he plain error doctrine . . . has been codified at Practice Book § 60-5, which provides in relevant part that [t]he court may reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . . The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Footnote omitted; internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 526, 911 A.2d 712 (2006).

We decline to invoke the plain error doctrine because we conclude that the habeas court's limited use of an exhibit that it found to be of little value, which was within its discretion as the trier of fact, did not affect the fairness or integrity of the proceedings, nor did it result in manifest injustice to the petitioner.

III

Finally, the petitioner claims that the habeas court erred when it sustained an objection to the admission of exhibit 7 for identification (exhibit 7) on hearsay grounds. The petitioner argues that the purpose of exhibit 7, which is a letter from the IRS to the petitioner that was addressed to the property searched by law enforcement, was to demonstrate that the petitioner believed that he was receiving sensitive financial documents at the property in a manner consistent with demonstrating that the petitioner had a reasonable expectation of privacy. The petitioner argues that the habeas court's ruling was premised on an incorrect interpretation of the Connecticut Code of Evidence because the exhibit was offered to show that the petitioner exhibited a subjective expectation of privacy that society also recognizes as reasonable. The respondent argues that exhibit 7 is an out-of-court statement offered for the truth of the matter asserted because its significance lay in the truth of its contents and that the court properly exercised its discretion in not admitting it into evidence. In the alternative, the respondent argues that any error in excluding the exhibit was harmless. We agree with the petitioner that the habeas court erroneously excluded exhibit 7; however, we conclude that the error was harmless.

Before turning to the specific evidentiary claim raised

by the petitioner, we first set forth our standard of review and other applicable law. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Milford Bank* v. *Phoenix Contracting Group, Inc.*, 143 Conn. App. 519, 532–33, 72 A.3d 55 (2013). Because the petitioner claims that the trial court's decision to exclude the evidence was based on an incorrect interpretation of the Connecticut Code of Evidence, our standard of review is plenary.

"An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *David P.* v. *Commissioner of Correction*, 167 Conn. App. 455, 478, 143 A.3d 1158, cert. denied, 323 Conn. 921, 150 A.3d 1150 (2016).

"The hearsay rule forbids evidence of out-of-court assertions to prove the facts asserted in them. If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay. . . . This exclusion from hearsay includes utterances admitted to show their effect on the hearer." (Citation omitted; internal quotation marks omitted.) *State* v. *Hull*, 210 Conn. 481, 498–99, 556 A.2d 154 (1989). "Because, however, the effect on the hearer rationale may be misapplied to admit facts that are not relevant to the issues at trial . . . courts have an obligation to ensure that a party's purported non-hearsay purpose is indeed a legitimate one. . . . Evidence is only admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . Accordingly, an out-of-court statement is admissible to prove the effect on the hearer only when it is relevant *for the specific, permissible purpose for which it is offered*." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 574, 46 A.3d 126 (2012). "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless

such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 23, 1 A.3d 76 (2010).

During the habeas trial, the petitioner offered exhibit 7 to show the type of mail that he had been receiving at the property. The petitioner argued to the court that he was not offering exhibit 7 for the truth of the matters contained in the letter from the IRS. The respondent objected on hearsay grounds. The court did not rule on the respondent's objection. The petitioner then offered exhibit 7 for a second time. On this occasion, the respondent objected on the grounds of hearsay and authenticity. The court sustained the hearsay objection and also ruled that exhibit 7 did not fall under the business records exception to the hearsay rule.

The record is clear that the petitioner offered exhibit 7 to demonstrate the type of mail that he received at the property, regardless of the truth of the matter asserted in the letter. The petitioner was not offering the exhibit to prove the facts asserted within the letter and, thus, the exhibit did not constitute hearsay. Accordingly, we conclude that the habeas court erroneously excluded exhibit 7 on hearsay grounds.[7]

Having concluded that the habeas court improperly excluded exhibit 7 on hearsay grounds, we turn to the question of whether the habeas court's decision constituted harmful error. "Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *State* v. *Kelsey*, 93 Conn. App. 408, 415, 889 A.2d 855, cert. denied, 277 Conn. 928, 895 A.2d 800 (2006). "Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of [a nonconstitutional] improper evidentiary ruling is borne by the [petitioner]. The [petitioner] must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 485, 797 A.2d 1101 (2002).

The petitioner, here, argued in his principal brief only that the habeas court's evidentiary ruling warrants reversal because the exclusion of exhibit 7 deprived the petitioner of the ability to demonstrate that he was receiving mail on a subject for which most people wish to exercise their right to privacy, which was the petitioner's inability to pay his taxes and his potential insolvency. In particular, the petitioner argued in that brief that exhibit 7 would have shown the character of the mail he received at the property in a compelling way that demonstrated his expectation of privacy at the property and, hence, his standing to pursue the motion to suppress. The petitioner made a much different argu-

ment regarding harm in his reply brief. In that brief, he argued for the first time that the "exclusion of [exhibit 7] impaired the petitioner's ability to prove that his trial attorney provided deficient representation and that the petitioner was harmed by it. . . . Exhibit 7 . . . was pertinent to the arguments that trial counsel did not properly research, investigate and prepare for the suppression [hearing]."

The respondent, in contrast, argues that the petitioner was not harmed by the habeas court's exclusion of exhibit 7 for the following three reasons. First, the respondent contends that the letter was cumulative of both the petitioner's testimony as to the volume and type of mail he received and of other exhibits admitted at the habeas trial. Second, the respondent argues that the petitioner testified without objection at the habeas trial that exhibit 7 was a letter he received at the property from the IRS concerning back taxes. Third, the respondent argues that it is unlikely that exhibit 7, if admitted, would have convinced the habeas court that Sobol had rendered ineffective assistance in litigating the motion to suppress. We are not persuaded by either of the petitioner's arguments.

With respect to his argument in his principal brief, the petitioner's harm analysis is misguided. The question is not, as the petitioner posits, whether the admission of exhibit 7 at the suppression hearing would have established his standing to pursue the motion to suppress. The proper question is whether the habeas court's error in sustaining the objection to the admission of exhibit 7 likely affected the outcome of the *habeas trial*. Put another way, had exhibit 7 been admitted into evidence at the habeas trial would it likely have affected the court's conclusion as to either the *Strickland* deficient performance or prejudice prong? The petitioner's principal brief engages in no such analysis. Consequently, the petitioner, in his principal brief failed to identify any cognizable harm arising from the habeas court's erroneous evidentiary ruling.

The petitioner attempted to remedy this deficiency in his reply brief by arguing that the exclusion of exhibit 7 was harmful because it impaired his ability to prove that Sobol performed deficiently. As noted previously in this opinion though, the petitioner's principal brief in no way argued that Sobol's performance was deficient because he failed to conduct a sufficient investigation as to the type of mail the petitioner received at the property. See footnote 4 of this opinion. It is "a well established principle that arguments cannot be raised for the first time in a reply brief. . . . [I]t is improper to raise a new argument in a reply brief, because doing so deprives the opposing party of the opportunity to respond in writing. . . . Specifically with regard to evidentiary rulings, this court, on multiple occasions, has declined to review claims where the appellant fails to

analyze harmful error in his or her principal brief." (Citations omitted; internal quotation marks omitted.) *State* v. *Myers*, 178 Conn. App. 102, 106–107, 174 A.3d 197 (2017). Consequently, although we have considered the harm argument made by the petitioner in his principal brief, we decline to consider the new and different harm argument raised for the first time in his reply brief.[8]

Thus, in light of the record, and the single harm argument presented by the petitioner in his principal brief, we conclude that the petitioner has failed to meet his burden to prove that the exclusion of exhibit 7 harmed him in a way that makes it more probable than not that the decision of the habeas court would have been different.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For convenience, we have reordered the petitioner's claims from how they are set forth in his principal brief.

[2] The United States Supreme Court in *Simmons* v. *United States*, supra, 390 U.S. 394, held that "when a defendant testifies in support of a motion to suppress evidence on [f]ourth [a]mendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."

[3] The court also concluded that the petitioner failed to present evidence as to what Phravixay would have testified to had he been called to testify at the suppression hearing. The petitioner argues that there was such evidence in the form of exhibit 13, a draft proffer prepared by Phravixay's attorney, which had been admitted as a full exhibit at the habeas trial. For a number of reasons, the court chose not to give any weight to that exhibit. See part II of this opinion. Consequently, on the basis of our review of the court's decision in its entirety, the court's conclusion that the petitioner had failed to present any persuasive evidence with respect to the potential testimony of Phravixay is not in error.

[4] In his principal brief, the petitioner argues that he was prejudiced by Sobol's deficient performance because there was evidence in the form of mail delivered to the petitioner at the property and an agreement he entered into when purchasing the property for the purchase of the furnishings located at the property, that would have established that the petitioner had a reasonable expectation of privacy at the property. None of the documents to which the petitioner refers was offered at the suppression hearing, although they were admitted into evidence at the habeas trial. Nevertheless, the petitioner made no argument in his principal brief that Sobol performed deficiently by not offering this mail or the furnishings agreement into evidence at the suppression hearing. In his reply brief, the petitioner for the first time argues that Sobol performed deficiently by failing to conduct an adequate investigation, including asking the petitioner about "the volume and character of mail he received" at the property.

At oral argument before this court, the petitioner's appellate counsel argued that the petitioner, in the appeal, properly raised a claim of failure to investigate. The petitioner's appellate counsel cited to the petitioner's petition for a writ of habeas corpus and also argued that the principal brief raises the claim, despite not directly identifying the claim as one involving a failure to investigate. We disagree. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016); see also *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 444 n.40, 35 A.3d 188 (2012) ("[c]laims are also inadequately briefed

when they are raised for the first time in a reply brief . . . or consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record" (citation omitted; internal quotation marks omitted)). Accordingly, this court will not review the claims that the petitioner raises for the first time in his reply brief and that were not presented properly to this court in his principal brief.

[5] "The defendant has not specifically identified his claim as falling under either the federal or state constitution. Because he does not claim that the state constitution provides greater protection in this regard than does the federal constitution, and because he has not presented a separate and adequate analysis under the state constitution . . . we regard his claim as being presented under the federal due process clause as applied to the state through the due process clause of the fourteenth amendment." (Citation omitted.) *State* v. *Rizzo*, 266 Conn. 171, 243 n.40, 833 A.2d 363 (2003).

[6] During closing arguments at the habeas trial, the petitioner's counsel argued that the information in the proffer showed that the petitioner had more significant ties to the property than what Sobol presented during the suppression hearing. Thus, the petitioner argued, the proffer supported the petitioner's claim that Sobol performed deficiently by not calling Phravixay to testify at the suppression hearing.

[7] Because we conclude that the letter from the IRS constituted nonhearsay, we need not decide whether the habeas court erroneously ruled that the letter does not fall under the business records exception.

[8] We also note that the petitioner in his reply brief did little to address the respondent's arguments as to why the court's error was harmless. We agree with the respondent that exhibit 7 was cumulative of other exhibits admitted during the habeas trial, particularly financial correspondence from his bank. In addition, the petitioner testified without objection about receiving exhibit 7 at the property and described it as a communication from the IRS concerning back taxes. Furthermore, it is undisputed that the petitioner had not given exhibit 7 to Sobol prior to the suppression hearing. Although the petitioner claims he did not look for the letter at the time because Sobol failed to tell him such correspondence was important, the petitioner testified that Sobol communicated to him prior to the suppression hearing about the importance of mail located on the property. The habeas court noted in its memorandum of decision that the petitioner appeared to contradict his own testimony concerning Sobol's alleged ineffectiveness in communicating the importance of mail located on the property to the petitioner. Finally, the habeas court, after noting the cumulative nature of the mail located on the property, found that none of the petitioner's clothes, toiletries, or other personal items were found at the property. Even the one piece of the petitioner's personal property, an aeration system, found on the property was addressed to the petitioner's Danbury residence.

---